# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 10, 2013

No. 11-31126

Lyle W. Cayce
Clerk

ROBERT E. ANTOINE,

Plaintiff-Appellant,

v.

FIRST STUDENT, INC.,

Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before STEWART, Chief Judge, and DeMOSS and GRAVES, Circuit Judges.

CARL E. STEWART, Chief Judge:

In an action for a religious observance accommodation under Title VII, Plaintiff-Appellant Robert Antoine appeals from the district court's ruling on summary judgment that Antoine's employer, Defendant-Appellee First Student, Inc. ("First Student"), reasonably accommodated his religion. We VACATE and REMAND for further proceedings.

No. 11-31126

## I. FACTUAL AND PROCEDURAL HISTORY[1]

Antoine has been a member of the Seventh-day Adventist faith for over thirty years. Seventh-day Adventists observe the Sabbath from sundown Friday to sundown Saturday, and they emphasize the importance of refraining from secular work during this time. While employed with First Student, Antoine held the leadership position of First Elder in his local congregation.

Antoine first worked for First Student as a bus driver for the Orleans Parish area during the 2008-2009 school year. During his first period of employment with First Student, Antoine never experienced a conflict with his religious observance of the Sabbath since he always completed his afternoon route on Fridays before sundown.

On June 23, 2009, Antoine applied to be a bus driver for First Student in the Jefferson Parish School District ("JPSD") for the 2009-2010 school year. First Student employee, Ella Cade, interviewed Antoine on July 1, 2009. Cade used a "Driver Interview Guide" form to structure and record her notes of the interview. The parties dispute the extent to which Antoine informed First Student of his schedule restrictions based on his religion when he applied to be a bus driver. Antoine informed First Student that he was able to work between 5:00 AM and 6:00 PM during the week, but not on weekends. Antoine also asserts that he discussed his religion and the limitations that it imposed on his availability on the Sabbath during the interview, although this issue was not a significant topic at the time of the interview from Antoine's perspective. Cade's deposition testimony indicated that she and Antoine "may have" discussed Antoine's religion but it was not a significant concern because First Student does

---

[1] In viewing the facts in the light most favorable to Antoine, we incorporate his asserted facts herein and note where facts are in dispute. *See Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001) (citation omitted) ("In deciding whether a fact issue has been created [on summary judgment], the court must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.").

not have work on weekends. Antoine did not anticipate any conflict between his work schedule and his religion when he began working for JPSD, given his prior experience working for First Student in Orleans Parish. First Student hired Antoine on July 23, 2009.

The relationship between First Student and its employees was governed by a Collective Bargaining Agreement ("CBA") that First Student entered into with the International Brotherhood of Teamsters, Local 270. According to the CBA, bus drivers bid on available routes at the beginning of the year and were awarded routes based on seniority. If a route remained unassigned after this bidding process, the route would be assigned to drivers who had not yet been assigned a route in reverse order of seniority. Those drivers who did not receive a route through the bidding process became "bench drivers." First Student called on bench drivers when the company needed a substitute driver.

During the relevant time period, Antoine was ranked number 114 out of 115 drivers on First Student's seniority list. Due to his lack of seniority, Antoine did not receive a route at the beginning of the 2009-2010 school year, and thus became a bench driver. An existing route–Route FS651–then became available on September 11, 2009. Antoine was assigned FS651, which consisted of three different schools–Ella C. Pittman Elementary School, Woodmere Elementary School, and St. Ville Academy for High School Preparation ("St. Ville"). Antoine typically completed his route, ending with St. Ville, around 5:40 PM each day. At the time he was assigned this route, Antoine did not inform First Student that he would be unable to complete his Friday shift on certain days after sundown.

During part of the school year, the requirements of Route FS651 conflicted with Antoine's religious beliefs. Once Daylight Savings Time ended on November 1, 2009, sunsets started occurring before Antoine's shift ended on Fridays. Specifically, sundown occurred before Antoine would have been able to

No. 11-31126

complete his route between November 6, 2009 and January 29, 2010. For this reason, Antoine would have been unable to complete Route FS651 on eight Fridays, not including days when school was not in session.

On Friday, October 30, 2009, Antoine realized that the impending end of Daylight Savings Time would conflict with his observance of the Sabbath. Antoine thus informed First Student that he would not be able to complete his Friday afternoon shifts from November through January. He first informed his dispatcher, Candace Astorga, of the impending conflict, and she told Antoine that she would need to speak with Ed Franklin, First Student's contract manager with the JPSD and Antoine's supervisor. Antoine also told a second dispatcher, Nadia Phillips, about the upcoming conflict. Phillips told Antoine that she could allow a substitute driver for his route so long as she received approval from Franklin.

On Monday, November 2, 2009, Antoine met with Franklin to describe the nature of his religious conflict. Specifically, Antoine told Franklin that he was a Seventh-day Adventist and since Daylight Savings Time had ended the day before, on November 1, 2009, he would be unable to drive his third route on Friday afternoons because it conflicted with the Sabbath.

Also on November 2, Franklin emailed Danny Guerdon, a Human Resources Manager at First Student, stating as follows:

> We have a notice from Employee Robert Antoine that he is not able to work on Friday PM because of his religion. He is a 7th day Advantage [sic]. I was not aware of this when he was hired; I need to know how do [sic] handle this? Where I'm sitting I can't allow this because this is a Monday thru Friday job. Please advise me on the situation.

No. 11-31126

Franklin's email prompted a series of correspondence among different Human Resources managers about Antoine's asserted need for an accommodation and the company's duty to accommodate.

Antoine and Franklin met again the morning of Friday, November 6, 2009. At this meeting, Franklin instructed Antoine that if Antoine could not complete all three of his routes on Friday afternoons, then he should stay home and not come to work that afternoon. Franklin also gave Antoine a warning letter for not driving his routes later that afternoon. Antoine asserts that the resolution of the November 6 meeting was that Franklin and the dispatchers would find a replacement driver for Antoine. Franklin and First Student assert, however, that Franklin told Antoine to find a replacement on his own. Judith Jackson, a union shop steward,[2] was present at both the November 2 and November 6 meetings.

The CBA contains a provision relating to voluntary route changes. This provision provides in full:

> Section 12–Voluntary Route Changes
>
> Drivers and Monitors shall select routes by seniority. There shall be no swapping of routes. A driver or monitor that wishes to vacate his/her route will have the route posted by the Employer and it will be advertised for three (3) days and assigned to the senior driver picking the route.
>
> The position vacated by the picking driver or monitor will be assigned to the driver or monitor that caused the vacancy. Only these two (2) drivers or monitors will be involved.

Due to the provision stating "[t]here shall be no swapping of routes," First Student asserts that part of its accommodation of Antoine was that it sought a

---

[2] A union shop steward is a union official who represents union employees and oversees the performance of union contracts. Black's Law Dictionary 1549 (9th ed. 2009).

No. 11-31126

"side agreement" or Memorandum of Understanding ("MOU") with the local union that would have permitted a voluntary shift swap for Antoine. Antoine contends, however, that "First Student never made any effort to negotiate the required local MOU."

Neither First Student nor Antoine secured a volunteer to swap shifts with Antoine. Franklin never attempted to arrange an exchange of shifts, and insists that it was Antoine's responsibility to find a shift swap. Meanwhile, Antoine disputes that it was his responsibility to find a replacement, arguing instead that it was First Student who offered to arrange the swap. Antoine still spoke to "a big group of drivers," including a group of bench drivers, during which time he expressed his disbelief that First Student could not find anyone to take his route.[3] Another driver, Moneik Lee, approached Antoine and volunteered to take some of his Friday afternoon routes after overhearing Antoine speak to a group of drivers about his plight. Lee offered to drive Antoine's assigned students home from St. Ville, the third of Antoine's routes, on one or two Fridays. When Antoine and Lee approached Franklin about the potential substitute, Franklin told Lee that Lee could take the St. Ville portion of Antoine's route only if Lee swapped routes with Antoine for the whole week. Lee declined to do so.

Antoine asked another driver, Percy Washington, about picking up all of Antoine's students from St. Ville, in case Lee was unable to do so. Antoine asked Washington because Washington picked up a different group of children from St. Ville at the same time as Antoine, and Antoine assumed Washington simply could take Antoine's children on Washington's bus instead. While it is unclear from the record exactly what Washington's response was, it appears that either

_____

[3] During his deposition, Antoine clarified that he could not specify the exact names of the drivers he spoke to because he was a new employee and did not know many of his co-workers' names. Jackson's affidavit also asserts that Antoine did not know the other drivers well because he was new to the location.

6

No. 11-31126

Washington or Antoine surmised that First Student would not permit the arrangement Antoine suggested because it violated First Student's contract with the JPSD. Antoine contends that he mentioned Washington to Franklin as another option, in case a substitution with Lee was not feasible; Franklin maintains, however, that Antoine never mentioned Washington to him. Moreover, First Student asserts that even though Antoine had a copy of the seniority list containing the names of all 115 drivers, Lee and Washington were the only two drivers Antoine contacted regarding a shift swap.[4]

In accordance with Franklin's instructions directing Antoine to stay home Friday afternoon if Antoine could not drive part of his afternoon routes, Antoine did not appear for work on November 6, November 13, November 20, December 4, or December 11. Antoine gave proper notice for all of his Friday absences, in compliance with First Student's absence policy. Following the progressive discipline policy set forth in the CBA, First Student first counseled Antoine for absenteeism through written warnings on November 6, November 18, December 1, and December 4. On December 14, First Student then suspended Antoine from December 15 to December 18. Jackson attended the meeting between Antoine and Franklin where they discussed Antoine's suspension. Finally, First Student terminated Antoine for excessive absenteeism on January 15, 2010. First Student was aware of the limited duration of Antoine's religious conflict.

On January 20, 2010, Antoine filed a charge of employment discrimination against First Student with the United States Equal Employment Opportunity Commission ("EEOC"). On August 25, 2010, Antoine received Notice of a Right to Sue from the EEOC. On November 23, 2010, Antoine then filed the instant suit against First Student under Title VII, alleging that First Student had discriminated against him based on his religion. On March 20, 2011, the parties

---

[4] As discussed *infra*, however, this assertion contradicts First Student's position before the district court.

consented to having Magistrate Judge Daniel E. Knowles hear the case. On November 4, 2011, the magistrate judge granted summary judgment to First Student, holding that First Student had satisfied its burden of showing that it had reasonably accommodated Antoine. Accordingly, the magistrate judge did not consider whether any of the alternative accommodations Antoine proposed would have imposed an undue hardship on First Student.

Antoine timely appealed.

## II. DISCUSSION

### A.     Standard of Review

We review a district court's grant of summary judgment de novo, applying the same standards as the district court. *Garcia v. LumaCorp, Inc.*, 429 F.3d 549, 553 (5th Cir. 2005). We also review a district court's conclusions of law, including contractual interpretations, de novo. *Id.* "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is material if its resolution could affect the outcome of the action." *Daniels*, 246 F.3d at 502 (citation omitted). "In deciding whether a fact issue has been created, the court must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Id.* (citation omitted). "We resolve factual controversies in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).

### B.     Applicable Law

Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "it shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's . . . religion . . . ." 42 U.S.C. § 2000e-2(a)(1). "An employer has the statutory obligation to make reasonable accommodations for the religious observances of its employees, but is not required to incur undue hardship." *Weber v. Roadway Express, Inc.*, 199 F.3d 270, 273 (5th Cir. 2000).

A plaintiff asserting a failure-to-accommodate claim under Title VII must satisfy the following elements of a *prima facie* case: (1) "that he had a *bona fide* religious belief that conflicted with an employment requirement"; (2) "that he informed the employer of his belief"; and (3) "that he was discharged for failing to comply with the conflicting employment requirement." *Id.* (citation omitted).

If the plaintiff can satisfy the prima facie showing, the burden shifts to the defendant to demonstrate either that it reasonably accommodated the employee, or that it was unable to reasonably accommodate the employee's needs without undue hardship. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68-69 (1986); *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 144 (5th Cir. 1982). "By its very terms the statute directs that any reasonable accommodation by the employer is sufficient to meet its accommodation obligation." *Ansonia*, 479 U.S. at 68. "[T]he extent of undue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship." *Id.* at 68-69. Whether an accommodation is reasonable is a question of fact. *See Turpen v. Mo.-Kan.-Tex. R.R. Co.*, 736 F.2d 1022, 1026 (5th Cir. 1984) (citations omitted) ("We must uphold the district court's factual determinations on the interlocking issues of 'reasonable accommodation' and 'undue hardship' unless they appear clearly erroneous.").

Both the Supreme Court and this court have held that a seniority-based system permitting employees to choose their own shifts, combined with an employer's offer to approve any voluntary shift swaps that the employee enters

No. 11-31126

into in a workplace where swapping is regular and accepted, constitutes a reasonable accommodation. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977); *Brener*, 671 F.2d 141.

In *Hardison*, the plaintiff began practicing a religion which prohibited secular work from sundown Friday to sundown Saturdays while he was employed with Trans World Airlines ("TWA"). *Hardison*, 432 U.S. at 67. TWA offered employees a seniority system under a CBA that allowed them flexibility in choosing their shifts. *Id.* Hardison's position required him to work Saturdays; thus, when Hardison informed his supervisor of his need for a religious accommodation, TWA agreed to the following accommodations: the union shop steward could seek a job swap for Hardison; Hardison would have his religious holidays off whenever possible if he agreed to work the traditional holidays when asked; and TWA would try to find Hardison another job that would be more compatible with his religious beliefs. *Id.* at 67-68. Hardison had sufficient seniority to bid on a shift that did not conflict with his religion, and the problem was solved temporarily. *Id.* at 68. When Hardison then transferred to another location where he had much lower seniority, he was unable to bid on a shift that allowed him to have Saturdays off always. *Id.* When TWA asked Hardison to work a Saturday shift while another employee was on vacation, TWA agreed to allow the union to seek a change in Hardison's work assignments; however, the union was not willing to violate the seniority provisions of the CBA. *Id.* TWA also rejected a proposal that Hardison only work four days per week because Hardison's job was essential and, on weekends, he was the only available person on his shift to perform it. *Id.* A transfer to a twilight shift also was unavailing because it required Hardison to work after sundown on Fridays. *Id.* at 69.

The Supreme Court held that TWA's efforts were reasonable. *Id.* at 77. In so holding, the Court observed that TWA's seniority system "itself represented

10

a significant accommodation to the needs, both religious and secular, of all of TWA's employees." *Id.* at 78. The Court reasoned, "neither a collective-bargaining contract nor a seniority system may be employed to violate [Title VII], but we do not believe that the duty to accommodate requires TWA to take steps inconsistent with the otherwise valid agreement." *Id.* at 79 (footnote omitted). The Court noted that the district court finding's demonstrated that the "seniority provisions . . . precluded the possibility of plaintiff's changing his shift." *Id.* at 83 n.14 (citation omitted). Accordingly, the Supreme Court agreed with the district court that "TWA had done all that it could do to accommodate Hardison's religious beliefs without either incurring substantial costs or violating the seniority rights of other employees." *Id.* (citation omitted). The Court also considered alternative accommodations and determined that they would be an undue hardship on TWA because they would require TWA "to bear more than a de minimis cost in order to give Hardison Saturdays off." *Id.* at 84.

In *Brener*, we considered the work-religion conflict of Brener, a pharmacist and Orthodox Jew, who was unable to work on the Sabbath because of his religion. *Brener*, 671 F.2d at 142-43. The employer in *Brener*, Diagnostic Hospital Center ("Diagnostic"), allocated shift assignments between five pharmacists on a rotating basis. *Id.* at 143. Because the pharmacy was opened on Saturdays and Sundays, each pharmacist was scheduled to work one out of five weekends. *Id.* Although the pharmacy director established the hours the pharmacy would be open, the pharmacists met monthly to arrange their own work schedules. *Id.* Once the schedules were established, the pharmacy allowed pharmacists who wanted to change their schedules to trade shifts with one another. *Id.*

Shortly after beginning his employment with Diagnostic, Brener informed the pharmacy director that his faith precluded him from working during the Sabbath. *Id.* Contrary to the director's policy of not interfering with the

No. 11-31126

pharmacists' schedules, he agreed to order schedule swaps so that Brener would not be required to work for the next two of three Saturdays Brener was scheduled to work. *Id.* Thereafter, Brener arranged a trade with another pharmacist so that he worked on Sunday instead of Saturday. *Id.* The director also ordered shift trades to accommodate Brener's observance of the Jewish holy days of Rosh Hashanah and Yom Kippur, a total of three days in early October. *Id.*

The director then began receiving complaints from other pharmacists regarding the "special treatment" of Brener. *Id.* When Brener requested four additional days off in late October to observe the Jewish holy day of Sukkos, the director informed Brener that, due to the morale problem among other pharmacists, the director would no longer order shift swaps; however, he would permit any swaps that Brener arranged with other pharmacists. *Id.* Brener failed to arrange an exchange of shifts and did not appear for work as scheduled on October 16 and 17. When Brener returned to work on October 18, he tendered his resignation to the director, but the director did not accept it immediately. *Id.* at 143-44. The director re-affirmed his commitment to approving any shift trades Brener arranged, but emphasized that he would not order the trades. *Id.* at 144. Brener did not arrange any trades and failed to report to work on October 23 and October 24 as scheduled. *Id.* When Brener returned to work on the October 25, the director accepted Brener's resignation. *Id.* Brener thereafter sued Diagnostic under Title VII, alleging that he was discharged because of his religion. *Id.* at 142-43.

We concluded that Diagnostic reasonably accommodated Brener, reasoning that Diagnostic's efforts were similar to TWA's actions in *Hardison*. *Id.* at 144-45 (citations omitted). We further observed, "The hospital . . . exceeded the efforts of Hardison's employer to accommodate his needs by deviating from established practice and experimenting with directing other employees to trade

schedules with Brener." *Id.* at 145 (citation omitted). We also determined that Brener failed to make a good faith effort to work within the hospital's flexible rotating shift system. *Id.* at 144, 146. Accordingly, we clarified the meaning of "reasonable" under Title VII:

> bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business. Although the statutory burden to accommodate rests with the employer, the employee has a correlative duty to make a good faith attempt to satisfy his needs through means offered by the employer.

*Id.* at 145-46. We thus held that Diagnostic's efforts constituted a reasonable accommodation. *Id.* at 145.

## C.    Parties' Arguments

On appeal, Antoine argues that the district court improperly granted summary judgment in First Student's favor on the affirmative defense of reasonable accommodation. First, he asserts that Franklin did not instruct him to find a replacement driver; moreover, even under First Student's version of the facts, "the most that First Student can claim to have done was merely 'attempt' to provide an 'opportunity'" for a shift swap. Second, Antoine argues that First Student's offer to accommodate him "had no effect upon the work-religion conflict" and, therefore, could not be a reasonable accommodation as a matter of law. Third, Antoine argues that Franklin "frustrated" any purported accommodation by attaching additional conditions when Lee offered to drive part of Antoine's route. Antoine thus argues that First Student not only failed to accommodate him by not finding him a voluntary swap, but also frustrated any potential accommodation when Antoine secured a possible replacement driver. Fourth, Antoine asserts that First Student made no effort to negotiate an MOU that would have modified the CBA. Fifth, Antoine maintains that the district

No. 11-31126

court's error in applying the wrong reasonable accommodation standard was compounded by the court's failure to consider the reasonable accommodations that were "available to (but ignored by) First Student." Finally, Antoine argues that First Student could have accommodated Antoine without undue hardship in a number of ways, including the use of unpaid leave, partial shift swaps or route adjustments, returning him to bench driver status, or using the voluntary route exchange process provided in the CBA.[5]

First Student argues that the magistrate judge correctly held that it reasonably accommodated Antoine. It points to three actions it took that it contends amount to a reasonable accommodation. First, it notes that it has a neutral system that permits employees to choose their own shifts based on seniority. This system, it argues, is similar to the system that the Supreme Court approved of in *Hardison*, 432 U.S. 63. Second, First Student argues that it offered Antoine the option of swapping shifts with whichever volunteers he could find. Third, First Student argues that it offered to seek an MOU with the local union, thus ensuring that the voluntary shift swap would be allowed under the CBA. Fourth, First Student argues that Antoine did not satisfy his duty to cooperate with First Student in taking advantage of the reasonable accommodations that First Student offered. Finally, First Student maintains that Antoine's proposed standard–that an accommodation is reasonable only if it completely eliminates the work-religion conflict–finds no support from case law.

---

[5] First Student incorrectly suggests that Antoine has waived any evidence or argument relating to an accommodation under the voluntary route change provision of the CBA because he did not raise this accommodation before the district court. The district court clearly stated in its order that "plaintiff argues the 'Voluntary Route Changes' ('VRC') section would have reasonably accommodated plaintiff."

**D.    Whether First Student Reasonably Accommodated Antoine**

The parties do not dispute that Antoine has made a *prima facie* showing of a failure-to-accommodate claim. Thus, we focus our inquiry on whether First Student has satisfied its burden of demonstrating either that it reasonably accommodated Antoine or that reasonable accommodation was impossible without undue hardship on First Student. *See Ansonia*, 479 U.S. at 68-69; *Brener*, 671 F.2d at 144. The district court issued its ruling on the basis of the first prong, that First Student had reasonably accommodated Antoine as a matter of law.

We conclude, however, that summary judgment is not appropriate at this stage of the litigation because there are genuine disputes of material fact regarding the very nature of the purported accommodation in this case. These factual disputes center around: 1) the accommodation to arrange a voluntary shift swap; and 2) the existence of a preliminary agreement by the local union to consider an MOU or other "side agreement" that would have permitted a voluntary shift swap under the CBA in Antoine's case. As to the first issue, First Student asserts that it was solely Antoine's responsibility to find a replacement driver, while Antoine asserts that First Student offered to find a substitute driver and then failed to follow through on this offer. As to the second issue, First Student contends that the CBA generally prohibits voluntary shift swaps, but that it intended to circumvent this general prohibition if Antoine first found someone to take his shift. On the other hand, Antoine asserts that First Student never pursued a preliminary agreement from the union to consider any alterations to the CBA in order to accommodate him. While these factual issues are interrelated, we address each in turn.

*1.    Factual Disputes Regarding the Voluntary Shift Swap*

Antoine contends that Franklin told him that First Student would arrange a voluntary shift swap for him. The following evidence in the record supports

Antoine's contention: 1) Antoine's deposition testimony; 2) Lee's deposition testimony; 3) Jackson's affidavit; and 4) First Student's answers to Antoine's first interrogatories. On the other hand, the depositions of Franklin and Guerdon support First Student's assertion that it offered Antoine the opportunity to find a voluntary replacement driver, not to find one for him.

### a.    *Antoine's Evidence*

Antoine testified in deposition about the circumstances surrounding his request for an accommodation to observe the Sabbath. In response to the question, "Who did you propose to take your route, your last route on Fridays?" Antoine replied, "It wasn't in my hands." In response to a similar question, "Who was supposed to do your third route?" Antoine responded: "I don't know. I asked to go on the bench or do two routes. They didn't accommodate." Here, Antoine's testimony indicates that he asked First Student to return to bench driver status or to drive two of his three routes, not including St. Ville, the last of his three schools. Antoine also testified that he did not ask Moneik Lee to take his route; rather, Lee heard about Antoine's need for a shift swap and volunteered to help him. Relatedly, Antoine testified that he asked another driver, Percy Washington, to take over Antoine's afternoon route, in case Lee was unable to do so. Antoine assumed that Washington simply could take the children from the St. Ville portion of Antoine's route on Washington's bus since Washington picked up a different group of children from St. Ville at the same time as Antoine. Antoine also testified that he told Franklin that Washington was willing to pick up Antoine's third route from St. Ville, but Antoine did not recall Franklin's response to this suggestion.

When later asked who were all of the people at First Student Antoine spoke to about his need to leave early on Fridays, he testified that he had spoken to the two dispatchers, Lee, Washington, Franklin, and some of the bench drivers, although he could not recall their names. In response to a subsequent

question inquiring whether Antoine asked any of these bench drivers to take his route, he stated, "I didn't ask." Thus, Antoine's deposition testimony demonstrates that he believed finding a replacement was not his responsibility, and that he asked Washington to take his route but he did not seek help from Lee or the bench drivers.

Lee likewise testified in deposition about the circumstances surrounding Antoine's need for a replacement, indicating that Antoine did not seek her out. She testified that she overheard Antoine speaking to a group of drivers, saying "[h]e couldn't believe that no one was able to work his shift, or would be able to work his shift." As a result, Lee offered to help Antoine by taking one or two of his Friday afternoons. When Antoine and Lee approached Franklin about Lee's offer to help Antoine, Franklin told Lee that she could not take just one or two of Antoine's Friday afternoon routes; rather, she would have to switch routes with Antoine completely, which Lee was unwilling to do. Thus, Lee's deposition indicates that she offered to help Antoine, and that Antoine was frustrated by the fact that a replacement driver apparently was not available.

Jackson's affidavit proffers evidence that it was First Student's responsibility to find a replacement driver for Antoine, and her contemporaneous notes of her meetings with Franklin and Antoine are attached to her affidavit. Jackson attested that, in the first meeting where Antoine formally discussed his religious conflict with Franklin on November 2, 2009, "Mr. Franklin . . . would see what he could do to resolve Mr. Antoine's conflict between his work and religion." Regarding the second meeting between Antoine and Franklin on November 6th, Jackson further attested:

> The outcome of the meeting . . . was that Mr. Franklin and the dispatchers would find a driver to swap routes with Mr. Antoine. Mr. Franklin did not tell Mr. Antoine to find a driver to swap routes with him. Mr.

No. 11-31126

> Antoine was new to this location and unfamiliar with
> the drivers and the routes of the drivers.

Jackson further asserted in her affidavit that she was present at all three meetings between Antoine and Franklin where they discussed Antoine's work-religion conflict, on November 2, November 6, and December 14.[6]

First Student's response to Antoine's first set of interrogatories in August of 2011 also indicates that it was First Student's responsibility to find Antoine a replacement. Antoine's Interrogatory No. 16 stated: "Please list all accommodations considered by First Student, even if rejected, in response to Plaintiff request for religious accommodation." First Student responded as follows: "Answering Interrogatory No. 16, Defendant states that it unsuccessfully tried to find drivers who can cover Plaintiff's Friday afternoon shifts; Defendant unsuccessfully tried to find route drivers who could switch with Plaintiff." Notably, First Student's response to these interrogatories did not state that *Antoine* failed to make this arrangement.

### b.    *First Student's Evidence*

First Student provided varying testimony on the nature of the accommodation the company offered Antoine. Guerdon testified in deposition that First Student considered voluntary shift swaps, the use of bench drivers, and an MOU with the local union allowing a short-term shift swap in order to accommodate Antoine. Franklin testified in deposition that the accommodation was the opportunity for Antoine to arrange a voluntary shift swap himself. Franklin did not recall Antoine asking to return to bench driver status. These inconsistencies alone, between different First Student managers, warrant the reversal of summary judgment, since it appears even First Student is unclear on the accommodation it offered Antoine.

---

[6] Jackson did not attend the meeting on January 15, 2010, when Franklin terminated Antoine.

18

First Student also repeatedly argues the fact that Antoine sought volunteers for his shift on his own illustrates that First Student told him to find a voluntary swap. Antoine's efforts do not prove First Student's allegation, however.[7] It is logical that a responsible employee would try to find a replacement for his shift under the circumstances, even in the absence of a directive telling him that he needed to do so. Thus, we interpret Antoine's efforts to find a replacement driver in the light most favorable to Antoine–that he sought a volunteer to take his shift *in tandem* with what were supposed to be First Student's efforts to find him one.

### c.     *Disputes of Material Fact Regarding Voluntary Shift Swap*

We therefore conclude that there exists a genuine dispute as to the voluntary shift swap that First Student alleges it offered Antoine as an accommodation. As a result, we do not reach the question of the reasonableness of said accommodation. Antoine clearly argues that, "[a]lthough Franklin now claims that he told Antoine that it was solely Antoine's responsibility to find drivers to exchange shifts, [Jackson],[8] who attended that meeting flatly contradicted Franklin's self-serving testimony." By concluding that "Franklin eventually recommended to plaintiff that he swap his Friday afternoon route

---

[7] First Student also has taken contrary positions regarding the extent of Antoine's efforts to find a volunteer to take his shift. Before the magistrate judge, counsel for First Student asserted, "Mr. Antoine indisputably went out and tried to find a voluntary shift swap and he did that by talking to a *group of bus drivers*. Undisputed he talked to Moneik Lee, he talked to Percy Washington, he couldn't find anybody." First Student relied on this greater number to support its contention that Antoine's request for an accommodation would constitute an undue hardship for the company. However, before this court, First Student has argued that Antoine failed in his duty to cooperate with his employer's accommodation by only speaking to two drivers, Lee and Washington, out of a total of 115 available drivers. Accordingly, these inconsistencies underscore the existence of a dispute over whose responsibility it was to find a shift swap for Antoine and what actions the company took under the alleged accommodation.

[8] Appellant's brief erroneously refers to the union representative who was present in the meetings between Franklin and Antoine as "Phillips"; we note, however, that the representative's name is actually Judith Jackson.

with a volunteer or find a volunteer to cover the Friday afternoon route," the district court did not view the facts in the light most favorable to Antoine.

2.     *Factual Disputes Regarding the Memorandum of Understanding*

The district court concluded that First Student's offer to allow Antoine to arrange a shift swap, combined with First Student's efforts to seek an MOU to approve any swaps Antoine could arrange, constituted the reasonable accommodation in this case.  The existence of the MOU is material insofar as Antoine apparently was unable to arrange a voluntary swap outside of the bidding process without the union's approval of the trade, at least according to First Student.  Thus, we next turn to the factual disputes concerning the MOU.

First Student repeatedly argues that the CBA prohibits the swapping of shifts based on the language in the CBA stating "there shall be no swapping of routes."  As a result, First Student asserts that it explored an MOU or side agreement with the union in order to accommodate Antoine by arranging a shift swap on a short-term basis.   Thus, part of First Student's purported accommodation is the union's commitment to *consider* allowing Antoine to swap his shift with another driver.  Antoine, however, relies on the CBA language to contend that it permits the swapping of routes under certain circumstances and that First Student failed to accommodate Antoine by not pursuing the options contained in the CBA.  Antoine further argues that First Student simply did not contact the union about this potential MOU.

Guerdon testified in deposition that First Student contacted the union about this potential MOU or "side agreement."  Guerdon stated that the union may agree, on a short-term basis, to help a bargaining unit member out by entering into a "side agreement."  Guerdon testified, "[i]f the timeline had been spelled out the union was willing to talk about it, but having said that, they had yet–they didn't commit until they found out exactly what both individuals [involved in the potential swap] were prepared to do."  Guerdon further stated:

> We contacted the union because of the swap language, and made them aware that we had an employee who had asked–and also made them aware too that there was an opportunity that another employee may be willing to, on a temporary basis in their mind, help that employee out by jumping in maybe for a couple of Fridays or so.
>
> . . . .
>
> So [the union is] willing to work with you, but at the end of the day if you want to change [the CBA] then they would say, "Well, we have to sit down. We have to bargain over it," and they would have to create an MOU, which is a Memo of Understanding, because it would be a fundamental changing of the contract, and we haven't done an MOU in–I don't think we've done an MOU here.

Jackson's affidavit controverts Guerdon's testimony, however. She stated: "I am unaware of any commitment from the union to consider a side agreement to the Labor Agreement to accommodate Mr. Antoine. As the shop steward for Mr. Antoine, I would have been informed of any such commitment concerning him." Antoine likewise was unaware of any effort on First Student's part to pursue this preliminary agreement from the union, and he disputes that First Student made any such effort.

Thus, there exists a dispute between the parties as to whether First Student attempted to negotiate an MOU with the local union as part of First Student's alleged attempt to accommodate Antoine. The district court therefore erred by resolving this factual dispute to conclude that "First Student sought to negotiate a commitment from the Union to consider a side agreement to the CBA to accommodate plaintiff once the parties had ironed out the details."

21

3.    *Materiality of Factual Disputes*

We conclude that the existence of genuine disputes of fact as to the reasonableness of any accommodation First Student provided Antoine precludes summary judgment at this stage.  The district court decided that allowing Antoine to swap shifts "by agreement between [Antoine] and a co-employee and a potential MOU with the union is a reasonable accommodation."  As we have discussed, however, the factual predicates underlying the district court's conclusion are in dispute.  Viewing the facts in the light most favorable to Antoine, First Student indicated that it would find Antoine a voluntary shift swap and then failed to follow through on this offer.   Thus, the only potential accommodation that First Student had in place was its neutral system for assigning shifts.  *See generally Hardison*, 432 U.S. 63; *see also Brener*, 671 F.2d 141.

In *Hardison*, the Supreme Court relied on the district court's finding that the "seniority provisions [in the CBA] . . . precluded the possibility of plaintiff's changing his shift." *Hardison*, 432 U.S. at 83 n.14 (citation omitted). Accordingly, the Court "d[id] not believe that the duty to accommodate require[d] TWA to take steps inconsistent with the otherwise valid agreement." *Id.* at 79. However, unlike the CBA in *Hardison*, the CBA here expressly provides a method for voluntary route changes–a process, moreover, that the *employer* facilitates.  That provision states, "A driver or monitor that wishes to vacate his/her route will have the route posted by the Employer and it will be advertised for three (3) days and assigned to the senior driver picking the route." Furthermore, both Antoine's deposition and Jackson's affidavit indicate that, at the time Antoine requested an accommodation, he was unaware of the terms or constraints of the CBA as a new driver, so he would have been unable to invoke the voluntary route change provision at the time he requested an accommodation.  We therefore decline First Student's invitation to hold, under

the facts of this case, that the mere existence of the CBA here is a reasonable accommodation *per se*: viewing the facts in Antoine's favor, First Student failed to follow through on its offer to assist Antoine in finding a replacement driver, and it did not pursue the procedures contained within the CBA for procuring a route swap.

Moreover, the Supreme Court decided *Hardison* following a bench trial, where the record was fully developed below, not on summary judgment. *See Hardison*, 432 U.S. at 69. Here, we have only First Student's assertions about the constraints of the CBA. Notably, the only union representative to weigh in on this issue, Jackson, also points to the voluntary route provision as a procedure that may have resolved Antoine's work-religion conflict. Jackson attested in her affidavit as follows:

> The Labor Agreement between First Student, Inc. and Teamsters, Local 270 prohibited the swapping of routes. What it did allow was the voluntary route change in Article IX, Section 12 of the agreement. Under that provision Mr. Antoine could have vacated his route by having it posted by First Student and advertised for three days. The route would have been assigned to the senior driver bidding on this route, including possibly bench drivers. If Mr. Franklin would have posted Mr. Franklin's route, I would have bid on this route and taken over Mr. Antoine's route to help him out.

Therefore, the procedural posture of this case, where there are material facts in dispute, also leads us to conclude that summary judgment in First Student's favor is not appropriate at this stage.

E.    **Whether Accommodating Antoine Constituted an Undue Hardship on First Student**

The parties dispute whether a reasonable accommodation was possible without undue hardship on First Student. Undue hardship exists when an employer is required to bear more than a de minimis cost. *Hardison*, 432 U.S.

at 84; *see also Weber*, 199 F.3d at 273 (citations omitted).  Specifically, *Hardison* concluded that an undue hardship is present if the proposed accommodation would force changes in the schedules of other employees and alter the employer's otherwise neutral procedure.  *Hardison*, 432 U.S. at 81.

The district court here indicated that it "need not reach the question of whether any accommodation suggested by plaintiff would pose an undue hardship on First Student."  *See Ansonia*, 479 U.S. 60 at 68-69 ("[T]he extent of undue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship.").  However, the district court also suggested in its opinion that accommodating Antoine would be an undue hardship on First Student.  Thus, to the extent that the district court reached the undue hardship question with respect to its interpretation of the CBA, we address the district court's interpretations of the CBA that will affect its undue hardship analysis on remand.  *See Garcia*, 429 F.3d at 553 ("We review a district court's . . . conclusions of law, including contractual interpretations, de novo.").

The district court made the following findings relating to undue hardship:

> The CBA generally prohibited the swapping of routes because it circumvented the bidding process based on seniority. . . .
>
> First Student . . . offered to seek an MOU with the union that would allow plaintiff to swap shifts in contravention of the CBA and the seniority system. . . .
>
> [T]he Fifth Circuit has never required an employer to rearrange its schedule and force employees to swap shifts to accommodate the religious practices of an employee . . . . Such a practice constitutes an undue hardship on First Student in and of itself.

We have observed already, however, that the CBA here provides a procedure for swapping routes that does not require a forced, unilateral reassignment by First

Student, *i.e.*, the voluntary route change provision in the CBA.  Therefore, this express contractual provision precludes a determination that a shift swap necessitated a violation of the CBA and thus constituted an undue burden on First Student.

We recognize that First Student has raised other reasons for why accommodating Antoine would have presented an undue hardship for the company, including the contentions that doing so would have required it to violate its contractual agreements with the JPSD or compromise child safety. We defer these issues to the district court to consider in the first instance.

## III. CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment in favor of First Student is VACATED, and this matter is REMANDED for further proceedings not inconsistent with this opinion