# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————————

No. 15-11297

————————

IN RE: MIRANT CORPORATION

_____

MC ASSET RECOVERY, L.L.C.,

     Appellant

v.

COMMERZBANK A.G.; BARCLAYS BANK, P.L.C.; BNP PARIBAS;
DANKSE BANK; ING BANK; ROYAL BANK OF SCOTLAND; ROYAL
BANK OF SCOTLAND N.V., formerly known as ABN AMRO Bank NV;
CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK, formerly
known as Credit Lyonnais, formerly known as Calyon; INTESA SAN PAOLO,
formerly known as Banca Intesa; ROYAL BANK OF SCOTLAND GROUP,
P.L.C.; AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED;
STICHTING EUROPEAN POWER ISLAND; EUROPEAN POWER ISLAND
PROCUREMENT B.V.,

     Appellees

————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:06-CV-13

————————————

United States Court of Appeals
Fifth Circuit

**FILED**

June 1, 2017

Lyle W. Cayce
Clerk

No. 15-11297

Before STEWART, Chief Judge, and KING* and DENNIS, Circuit Judges.

PER CURIAM:**

This case is born of a long-running bankruptcy dispute relating to a financing arrangement for a failed development project involving nine "power islands." The central issue relates to MC Asset Recovery, LLC ("MCAR")'s attempt to recover payments made by its parent, Mirant Corporation ("Mirant"), to Commerzbank AG and syndicated lenders (Commerzbank and the lenders, collectively, the "Lenders") pursuant to a repayment guaranty (the "Subject Guaranty") issued in order to secure financing from those lenders. The district court granted summary judgment for the Lenders and denied partial summary judgment to MCAR. MCAR appeals both the grant and the denial. We affirm.

## I.

Mirant was an energy company headquartered in Georgia and operating in North America, Europe, and Asia. It conducted business through subsidiaries, including Mirant Asset Development and Procurement B.V. ("MADP"), and Mirant Americas, Inc. ("MAI"). The dispute here centers on a series of transactions involving Mirant and its subsidiaries between 2000 and 2001, all relating to construction and acquisition of power islands—massive and expensive power-generating structures—to be deployed in Europe.

Mirant formed MADP for the purpose of executing a Master Equipment Purchase and Sale Agreement ("MPA") with General Electric and its international affiliate (collectively, "GE") to secure up to nine power islands.

---

* Judge King concurs in the judgment only.

** Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-11297

Mirant also executed an agreement guaranteeing MADP's obligation to make payments of the amounts due and payable under the MPA (the "Equipment Guaranty") for construction and delivery. Mirant sought to finance the purchase and construction of these islands on an "off balance sheet basis," and in pursuit of this objective it entered into two successive financing arrangements—one with Westdeutsche LandesBank Girozentrale ("WestLB"), and one with the Lenders.

The arrangement with WestLB was intended to serve as an intermediate source of financing to make payments to GE while a longer term solution could be found. In order to accomplish this intermediate goal, Mirant acted to bring the MPA under the auspices of a preexisting financing arrangement between WestLB and MAI—formalized by the C98 Agreement—that Mirant guaranteed. To do so, WestLB, MAI, and MADP concluded the Owner Assignment and Assumption Agreement (the "OAA agreement") on February 15, 2001, which assigned MADP's rights under the MPA to WestLB and provided for WestLB to assume MADP's payment obligations. It also provided (with GE's consent) that Mirant "shall be released from its obligations . . . under the [Equipment Guaranty], provided, however, that the [Equipment Guaranty] shall be deemed reinstated and in full force and effect upon any assignment by [WestLB] of its interest in the [MPA] to [MADP or] an Affiliate of [MADP]."

That same day, WestLB, MAI, and MADP concluded an Addendum to the C98 Agreement. Under the Addendum, MADP had until May 30, 2001, to repurchase the rights recently assigned to WestLB (and thereby repay WestLB for its payments to GE). Mirant also concluded a Reaffirmation of Guaranty agreement through which it guaranteed the obligations of its subsidiaries to WestLB (the "WestLB Guaranty").

3

No. 15-11297

Mirant then sought longer-term financing arrangements from the Lenders. On May 25, 2001, WestLB, MAI, MADP, and European Power Island Procurement B.V. ("EPIP")—a newly formed special purpose limited-liability company set up to act as the owner/assignee of the MPA—entered into a Purchase Option Assignment and Assumption Agreement (the "POAA"). Pursuant to that agreement, EPIP paid WestLB €23,479,231.25[1]—the purchase price under the C98 Addendum, representing WestLB's previous payments to GE, plus a financing charge—and obtained WestLB's rights under the MPA. The purchase price paid by EPIP and future payments to GE were advanced pursuant to a Participation Agreement between certain of the Lenders, EPIP, and MADP, executed the same day.[2]  Under that agreement and a related Procurement Agency Agreement between EPIP and MADP, MADP was responsible for administering the acquisition and construction of the power islands and, ultimately, repaying the Lenders by purchasing the power islands from EPIP for an amount representing the funds advanced by the Lenders, plus a financing charge.[3] Mirant issued the Subject Guaranty in favor of the Lenders, under which Mirant guaranteed MADP's payment obligations under the loan documents. The ultimate goal of the project was to place power islands at sites in Europe to attract "take-out" financing, by means

---

[1] $US 21,016,259.83. All Euro to US Dollar conversions were calculated using the average exchange rate during the year 2001 which, according to authoritative sources, was EUR/USD 0.89 (that is, EUR 1.00 bought USD 0.89). Canadian Forex, *Yearly Average Exchange Rates for Currencies*, http://www.canadianforex.ca/forex-tools/historical-rate-tools/yearly-average-rates (last visited May 30, 2017); Federal Reserve, *Historical Rates for the EU Euro*, https://www.federalreserve.gov/releases/H10/Hist/dat00_eu.htm (last visited May 30, 2017). The exchange rate at the time of this writing is roughly EUR/USD 1.12, meaning EUR 1.00 buys USD 1.12.

[2] The Participation Agreement was subsequently amended in August 2001 to add the remaining Lenders.

[3] To take advantage of then-existing financial accounting rules, MADP also had the option to lease or remarket the power islands.

4

of which Mirant would repay the Lenders. It is the Subject Guaranty that Mirant seeks to avoid in this lawsuit.

Mirant's plans for European expansion began to collapse less than a year later, prompting Mirant and MADP ultimately to repurchase and cancel the orders for all nine of the power islands. Pursuant to the loan documents and to the Subject Guaranty, Mirant was forced to make four payments to the Lenders totaling €136.9 million.[4] This sum represented the progress payments on the power islands that the Lenders had already advanced as payments to GE, plus a finance charge. Following these payments, Mirant and several affiliates filed for Chapter 11 bankruptcy. The confirmed bankruptcy plan provided for the creation of a special litigation entity, MCAR, which brought this action in federal district court to avoid the Subject Guaranty and recover the payments previously made to the Lenders as fraudulent transfers.

## II.

After an earlier decision of this court determining that New York law applies to this case, and after several years of discovery, the parties filed cross-motions for summary judgment in early 2015. The crux of the dispute related to whether fair consideration supported the Subject Guaranty. Under New York law, obligations incurred by "a person who is or will be thereby rendered insolvent [are] fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." N.Y. Debt. & Cred. § 273 (McKinney 2016). Fair consideration is given for an obligation "[w]hen in exchange for such . . . obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied." *Id.* § 272(a).

---

[4] $US 122,539,189.66

No. 15-11297

To avoid summary judgment, MCAR was required to adduce evidence demonstrating that the Subject Guaranty and payments made thereunder exceeded the amount of antecedent debt that was satisfied in the transaction involving the Subject Guaranty. This would establish a lack of fair equivalency in what was received for issuing the Subject Guaranty.[5]

On fair equivalency the parties did not dispute (1) the series of transactions leading to the lawsuit in this case; or (2) that at least €23,479,231.25[6] in antecedent debt—the termination amount that Mirant guaranteed to WestLB and that EPIP paid to WestLB with financing obtained from the Lenders—was satisfied. The dispute related to the extent of any *additional* antecedent debt satisfied by the Subject Guaranty.

MCAR argued that when the Subject Guaranty was executed, neither Mirant nor any of its subsidiaries held existing liabilities to WestLB because, under the OAA agreement, both Mirant and MADP were released from existing obligations to GE under the MPA and the Equipment Guaranty. This meant that Mirant's assumption of €600 million[7] in so-called "new" liability through the Subject Guaranty could not have satisfied an antecedent obligation over and above the amount of the termination payment, because no such obligation existed.

The district court disagreed, and based on three findings, it ruled that equivalent antecedent debt had in fact been satisfied. First, the court found that EPIP was an "affiliate" of Mirant as defined in the C98 Agreement and

---

[5] The district court also evaluated the Lenders' good faith in entering into the transaction and held that MCAR had "wholly failed to present evidence suggestive of any fraudulent scheme by Mirant and the lenders."

[6] $US 21,016,259.83

[7] $US 537,059,998.51

incorporated by reference into the OAA agreement.[8] This was because MADP and EPIP were in a partially reciprocal relationship of control that permitted MADP to direct EPIP's actions relating to acquisition of the power islands with total freedom under the POAA—apart from an admonition to stay within the agreed budget and not to terminate an order for an island without EPIP's consent. Second, because EPIP was an affiliate of Mirant, WestLB's assignment to EPIP of obligations under the MPA "reinstated" Mirant's obligations to GE under the Equipment Guaranty, pursuant to the reinstatement provision discussed above. Third, the district court found that no detailed calculation of the value given by and received in exchange for the Subject Guaranty was necessary, as "the Subject Guaranty essentially replaced the reinstated Equipment Guaranty," allowing Mirant to "obtain[] funds for MADP to use to pay the payments required under the agreement with GE, thus reducing Mirant's risk under the Equipment Guaranty euro for euro." In other words, Mirant substituted a guaranty to one entity for a guaranty to another entity, and by means of that substitution received loaned capital that could be used to meet obligations owed to the first entity—that is, to GE.

On appeal MCAR challenges the district court's fair equivalency ruling on the grounds that: (1) EPIP was not an affiliate of MADP, and so the Equipment Guaranty could not have been reinstated; (2) even if the Equipment Guaranty was reinstated, there is no evidence that it was replaced by the Subject Guaranty; (3) the district court failed to follow the proper formula in

---

[8] The C98 Agreement defined "affiliate" as "another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified." The agreement further defines "control" as "the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities or by contract or otherwise."

No. 15-11297

measuring fair equivalency; (4) the Equipment Guaranty cannot qualify as "antecedent" debt because it would have been reinstated at the same time that the Subject Guaranty was issued, making the debt "contemporaneous" rather than "antecedent"; and (5) the Lenders' financing satisfied no more than €23,479,231.25[9] worth of antecedent debt because only actually due legal liability to pay for past events can qualify as "antecedent," not agreed-upon future liability. MCAR also challenges the district court's ruling on the Lenders' good faith.

### III.

"We review a district court's grant of summary judgment de novo, applying the same standards as the district court." *Antoine v. First Student, Inc.*, 713 F.3d 824, 830 (5th Cir. 2013).

Review of the record and applicable case law indicates that all three of the key findings on which the district court relied are well supported. The court's conclusion that EPIP qualified as an "affiliate" of MADP under the relevant agreements accords with the plain meaning of the language used in those agreements and is based on key facts that are beyond dispute. The same is true of the district court's related conclusion that the Equipment Guaranty was reinstated. Further, the district court's determination as to the replacement of one guaranty by the other—a process that this court understands less as a literal proposition than as a functional one—is supported by relevant statutory language establishing the validity of contingent debt, and is not precluded by any requirement to apply a particular formula in these circumstances.

After considering the parties' arguments as briefed on appeal, and after reviewing the record, the applicable law, and the district court's detailed and

---

[9] $US 21,016,259.83

thorough judgment and reasoning, we AFFIRM the district court's judgment and adopt its analysis in full.