**REVISED AUGUST 26, 2014**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

August 26, 2014

Lyle W. Cayce
Clerk

No. 13-20610

LOIS M. DAVIS,

Plaintiff–Appellant

v.

FORT BEND COUNTY,

Defendant–Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before SMITH, WIENER, and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Plaintiff–Appellant Lois M. Davis ("Davis") filed suit against her former employer, Defendant–Appellee Fort Bend County ("Fort Bend"), alleging discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2000e-17 ("Title VII"). The district court granted Fort Bend's motion for summary judgment on both claims. For the reasons stated below, we affirm in part and reverse in part.

### I.   FACTUAL AND PROCEDURAL BACKGROUND

Fort Bend hired Davis in December 2007 as a Desktop Support Supervisor responsible for supervising about fifteen information technology

No. 13-20610

("IT") technicians. Charles Cook ("Cook") was the IT Director at the time. In November 2009, he hired his personal friend and fellow church member, Kenneth Ford ("Ford"), as Davis's supervisor.

On or about April 1, 2010, Davis filed a complaint with Fort Bend's Human Resources Department, alleging that Cook subjected her to constant sexual harassment and assaults soon after her employment began. Fort Bend placed Davis on Family Medical Leave Act ("FMLA") leave during its investigation of her complaint. The investigation substantiated Davis's allegations against Cook and ultimately led to Cook's resignation on April 22, 2010.

According to Davis, Ford immediately began retaliating against her when she returned to work from FMLA leave. She alleged that Ford "effectively" demoted her by reducing the number of her direct reports from fifteen to four; removed her from projects she had previously managed; superseded her authority by giving orders and assigning different projects and tasks directly to Davis's staff; removed her administrative rights from the computer server; and assigned her tasks that similarly situated employees were not required to perform.

In March 2011, Fort Bend prepared to install personal computers, network components, and audiovisual equipment into its newly built Fort Bend County Justice Center. All technical support employees, including Davis, were involved in the process. As the Desktop Support Supervisor, Davis and her team were to "assist with the testing of the computers [and] make sure all of the computers had been set up properly." The installation was scheduled for the weekend of July 4, 2011, and all employees were required to be present.

On June 28, 2011, Davis informed Ford that she would not be available to work the morning of Sunday July 3, 2011, allegedly "due to a previous

2

religious commitment." Davis testified that "[i]t was a special church service, and that I needed to be off that Sunday[,] . . . but I would be more than willing to come in after church services." Davis also testified that she had arranged for a replacement during her absence, as she had done in the past. Ford did not approve her absence, stating that it "would be grounds for a write-up or termination." After Davis attended her church event and did not report to work, Fort Bend terminated Davis's employment.

Davis filed suit against Fort Bend, alleging retaliation and religious discrimination under Title VII, and intentional infliction of emotional distress. The district court granted Fort Bend's motion for summary judgment on all claims and dismissed Davis's action. Davis timely appealed the district court's grant of summary judgment. On appeal, Davis challenges the grant of summary judgment on her Title VII claims, but not on her intentional infliction of emotional distress claim.

## II.   JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction over Davis's Title VII claims pursuant to 42 U.S.C. § 2000e-5(f)(3). Because this is an appeal of a final judgment of a district court, this court has jurisdiction under 28 U.S.C. § 1291.

This court reviews the district court's ruling on summary judgment de novo, applying the same standard as the district court in the first instance. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citation omitted). "Summary judgment should be granted when the moving party shows that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). A genuine dispute of material fact exists when the "'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Royal v. CCC&R Tres Arboles,*

*L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. The court must "draw all reasonable inferences in favor of the nonmoving party" and "refrain from making credibility determinations or weighing the evidence." *Turner*, 476 F.3d at 343 (citation and internal quotation marks omitted). A party cannot "defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Id.* (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).

## III.   DISCUSSION

Davis argues that the district court erred when it granted summary judgment for Fort Bend as to her Title VII religious discrimination claim and as to her retaliation claim. We address each argument in turn below.

### A.   Davis's Title VII Religious Discrimination Claim

As explained below, the district court erred when it granted summary judgment in favor of Fort Bend on Davis's Title VII religious discrimination claim. Title VII prohibits an employer from discriminating against an employee on the basis of her religion. 42 U.S.C. §§ 2000e-2(a)(1), 2000e(j). "An employer has the statutory obligation to make reasonable accommodations for

the religious observances of its employees, but is not required to incur undue hardship." *Weber v. Roadway Express, Inc.*, 199 F.3d 270, 273 (5th Cir. 2000).

This court analyzes a Title VII claim for a failure to accommodate religious observances under a burden-shifting framework akin to the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework. The employee must first establish a prima facie case of religious discrimination. *Antoine v. First Student, Inc.*, 713 F.3d 824, 831 (5th Cir. 2013). If she does, "the burden shifts to the defendant to demonstrate either that it reasonably accommodated the employee, or that it was unable to reasonably accommodate the employee's needs without undue hardship." *Id.* Here, a genuine dispute of material fact exists at both steps.

1.   Davis's Prima Facie Case Survives Summary Judgment

Davis has presented evidence demonstrating a genuine dispute of material fact on her prima facie case and, thus, survives the first step. As we have previously stated:

> To establish a prima facie case of religious discrimination under Title VII, the plaintiff must present evidence that (1) she held a bona fide religious belief, (2) her belief conflicted with a requirement of her employment, (3) her employer was informed of her belief, and (4) she suffered an adverse employment action for failing to comply with the conflicting employment requirement.

*Tagore v. United States*, 735 F.3d 324, 329 (5th Cir. 2013) (citing *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 499 n.9 (5th Cir. 2001)).

The parties dispute only the first element: whether Davis's observance of her church's July 3rd event was pursuant to her bona fide religious belief. Bona fide religious beliefs include "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." *See, e.g.*, 29 C.F.R. § 1605.1 (citing *United States v. Seeger*, 380 U.S.

163 (1965)).   A court's inquiry is limited to focusing upon the individual's motivation.   Specifically, a court's task is to decide "whether [the individual's beliefs] are, *in his own scheme of things*, religious."   *Seeger*, 380 U.S. at 185 (emphasis added).   In this regard, a belief is "religious" if it is "[a] sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by . . . God."   *Seeger*, 380 U.S. at 176.   Conversely, whether the belief itself is central to the religion, i.e., whether the belief is a true religious tenet, is "not open to question."   *Moussazadeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781, 790 (5th Cir. 2012) (quoting *Seeger*, 380 U.S. at 185) (internal quotation marks omitted) (discussing the threshold inquiry into a person's religious belief under the Religious Land Use and Institutionalized Persons Act); *see Tagore*, 735 F.3d at 328–29 (applying *Moussazadeh* to a Title VII religious discrimination claim).

The sincerity of a person's religious belief is a question of fact unique to each case.   *Tagore*, 735 F.3d at 328; *Moussazadeh*, 703 F.3d at 791 ("This is doubly true regarding sincerity.").   "The specific religious practice must be examined rather than the general scope of applicable religious tenets, and the plaintiff's 'sincerity' in espousing that practice is largely a matter of individual credibility."   *Tagore*, 735 F.3d at 328; *see also Moussazadeh*, 703 F.3d at 791 ("[T]he important inquiry was what the prisoner claimed was important to him." (alteration in original) (citation and internal quotation marks omitted)).

This court has cautioned that judicial inquiry into the sincerity of a person's religious belief "must be handled with a light touch, or judicial shyness."   *Tagore*, 735 F.3d at 328 (citation and internal quotation marks omitted).   "[E]xamin[ing] religious convictions any more deeply would stray into the realm of religious inquiry, an area into which we are forbidden to tread."   *Id.* (alteration in original) (citation and internal quotation marks

omitted).  Indeed, "the sincerity of a plaintiff's engagement in a particular religious practice is rarely challenged," and "claims of sincere religious belief in a particular practice have been accepted on little more than the plaintiff's credible assertions." *Id.*

We emphasize that this limited inquiry is being decided on summary judgment in this case.  Thus, the issue here is whether there exists a genuine dispute of material fact whether Davis sincerely felt that she was religiously compelled to attend and participate in a special service at church on Sunday, July 3.

In Davis's view, her bona fide belief that she was religiously compelled to attend the event is supported by her testimony that she is a devout member of the Church Without Walls.  Specifically, she refers this court to her testimony that she attends at least two services every weekend; she volunteers for the church; the pastor knows her and would vouch for her; and she believed strongly that she "needed" to be at church on Sunday, July 3, 2011, as a religious matter.  As the nonmoving party on summary judgment, Davis contends that the court must draw the inference in her favor that her decision to attend church was religious, "at the very least in her own scheme of things."

Fort Bend asserts without analysis or argument that Davis's reason for not working on July 3—breaking ground for a new church and feeding the community—"is not a religious belief or practice."  Fort Bend also includes the majority of the district court's reasoning verbatim.  The district court noted that "being an avid and active member of church does not elevate every activity associated with that church into a legally protectable religious practice."  The district court then found that Davis's "absence from work was due to personal commitment, not religious conviction," because she described her obligation as

a "request[]" from her Pastor that all members participate in the "community service event."

We disagree with Fort Bend and the district court. Neither addresses whether Davis's religious belief was sincere and, instead, both improperly focus upon the nature of the activity itself. A showing of sincerity, however, does not require proof that the July 3rd church event was in itself a true religious tenet, but only that Davis sincerely believed it to be religious in her own scheme of things. *See Moussazadeh*, 703 F.3d at 791 ("Individuals may practice their religion in any way they see fit, and it is not for the Court to say it is an unreasonable one. A showing of sincerity does not necessarily require strict doctrinal adherence to standards created by organized religious hierarchies." (citation and internal quotation marks omitted)). Thus, even if attendance at the "community service event" was arguably not a religious tenet but a mere request by her Pastor, "[t]hese telling arguments address an issue that is not for federal courts, powerless as we are to evaluate the logic or validity of beliefs found religious and sincerely held." *See Cooper v. Gen. Dynamics, Convair Aerospace Div., Fort Worth Operation*, 533 F.2d 163, 166 n.4 (5th Cir. 1976) (chastising a district court for having "evaluated the tenet and concluded that it was irrational and specious").

Focusing on the sincerity of Davis's belief, as we must, we hold that her prima facie case survives summary judgment. Davis testified about her devotion to church and that she was "[a]bsolutely not" "just a weekend warrior." Instead, she was actively committed to her church "because [she] believe[d] in something," sometimes attending up to three services every Sunday. Regarding the particular Sunday at issue here, July 3, 2011, she testified that she "needed" to attend "a special church service." She similarly alleged in her complaint that "she would be unavailable for work on Sunday

July 3, 2011 due to previous religious commitment." Although her complaint also noted that her "Pastor *requested* that all members participate in this highly anticipated *community service event*" (emphasis added), we must "refrain from making credibility determinations or weighing the evidence." *Turner*, 476 F.3d at 343; *see, e.g., Seeger*, 380 U.S. at 184 ("Religious experiences which are as real as life to some may be incomprehensible to others." (quoting *United States v. Ballard*, 322 U.S. 78, 86 (1944))); *Tagore*, 735 F.3d at 328 (holding that plaintiff's sincerity "is largely a matter of individual credibility"). Such restraint is particularly important here, where a court "must refuse to dissect religious tenets just because the believer['s] . . . beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *A.A. v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 261 (5th Cir. 2010).

Accordingly, drawing all reasonable inferences in favor of Davis as the nonmoving party, and considering the "light touch" and "judicial shyness" that must be exercised, Davis's testimony about her own sincere belief regarding her religious need to attend a special service at church on Sunday sufficiently evidenced a genuine dispute of material fact whether she held a bona fide religious belief. *See Tagore*, 735 F.3d at 328 ("[C]laims of sincere religious belief in a particular practice have been accepted on little more than the plaintiff's credible assertions.").

2. The Burden Shifts to Fort Bend

At the next step, Fort Bend may assert its affirmative defenses and "demonstrate either that it reasonably accommodated the employee, or that it was unable to reasonably accommodate the employee's needs without undue hardship." *Antoine*, 713 F.3d at 831. On summary judgment, Fort Bend

No. 13-20610

asserted only undue hardship, which "exists when an employer is required to bear more than a de minimis cost." *Id.* at 839 (citation omitted).

Davis argues that, on the merits,[1] Fort Bend did not present evidence that it could not reasonably accommodate her religious observance without an undue hardship. According to Davis, she asked only to be absent the morning of July 3 and promised to report to work directly after the July 3rd event. Not only was this "short period of absence" minimal under Title VII, but Davis claims she arranged for a substitute for the hours she would be absent. Moreover, Davis contends we should not give credit to Fort Bend's purported undue hardship because Fort Bend permitted another employee to take time off to attend a parade that same weekend.

In response, Fort Bend cites a string of circuit precedent—*see, e.g.*, *Bruff*, 244 F.3d at 501; *Weber*, 199 F.3d at 274; *Eversley v. MBank Dall.*, 843 F.2d 172, 176 (5th Cir. 1988); *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141 (5th Cir. 1982)—for the proposition that requiring one employee to substitute for another presents an undue hardship. Additionally, Fort Bend asserts that Davis's role as Desktop Support Supervisor was vital to the efficiency of the move. Thus, her absence not only increased the risk that the computers would not be timely installed and functional, but also required other employees to take on additional duties or change their schedules. Finally, Fort Bend

---

[1] Davis also argues that Fort Bend waived the affirmative defense of undue hardship. A district court's ruling on waiver is typically reviewed for abuse of discretion, *Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co.*, 706 F.3d 622, 633 (5th Cir. 2013), but the district court has not addressed the issue. Given the "fact-specific" inquiry required, *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999), the district court will be in a better position to decide whether Fort Bend has waived the defense. Accordingly, and because we resolve this issue in Davis's favor regardless, we decline to address waiver.

disregards the substitute Davis arranged because Davis did not have the authority to make such schedule changes.

The district court found that Davis did not offer any evidence to rebut Fort Bend's undue hardship defense. Davis did provide a fellow supervisor's affidavit, in which the supervisor averred that Ford denied his request to permit his employees to attend church services on July 3rd. But, the district court found that the affidavit instead bolstered Fort Bend's position, reasoning that "all such requests were denied because granting any particular one would have adversely affected other employees." "[R]ather than evidence of religious discrimination," the district court continued, "there is evidence only of a neutral policy denying all requests for time off."

We disagree with Fort Bend and the district court on this issue as well. First, the district court improperly inferred facts against the nonmoving party, Davis, when it concluded that Ford denied the requests "because granting any particular one would have adversely affected other employees." However, because there was nothing in the affidavit hinting at Ford's reason for denying the request, the district court's conclusion was improper. *See Turner*, 476 F.3d at 343 (explaining that a court must draw all reasonable inferences in favor of the nonmoving party on summary judgment). Next, the district court compared Davis to similarly situated employees within the *same* protected class—i.e., those with religious observances. But, the proper comparators are "similarly situated employees *outside* the protected group." *See, e.g.*, *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007) (per curiam) (emphasis added). In that regard, Davis testified that Ford permitted another employee time off to attend a Fourth of July parade the weekend of the move.

We also reject Fort Bend's arguments because, even though Fort Bend correctly recites precedent, it misapplies law to facts. Fort Bend correctly

asserts that requiring an employee to substitute for Davis's absence may, as a matter of law, impose more than a de minimis cost. *See, e.g.*, *Bruff*, 244 F.3d at 501 ("Requiring one or both counselors to assume a disproportionate workload, or to travel involuntarily with Bruff to sessions to be available in case a problematic subject area came up, is an undue hardship as a matter of law."). Fort Bend is also correct that permitting Davis to be absent may leave it short-handed and, therefore, impose an undue hardship as a matter of law. *See, e.g.*, *Trans World Airline, Inc. v. Hardison*, 432 U.S. 63, 84 (1977) (holding that to leave the employer short-handed would involve costs to the employer "in the form of lost efficiency"). But these cases do not apply to the facts here because there was a ready and willing *volunteer* to substitute for Davis.

Substituting a volunteer does not necessarily impose the same hardship on the employer, if any, as requiring an employee to substitute for another's religious observance. In holding that Title VII does not require an employer to substitute employees, the Supreme Court in *Hardison* stated "[t]here were no *volunteers* to relieve Hardison on Saturdays, and to give Hardison Saturdays off, TWA would have had to deprive another employee of his shift preference at least in part because he did not adhere to a religion that observed the Saturday Sabbath." 432 U.S. at 81 (emphasis added). In *Eversley*, we relied on this language from *Hardison* to hold that "it is unreasonable and an undue hardship on an employer to require the employer to *force* employees, over their express refusal, to permanently switch from a daytime to a nighttime shift in order to accommodate another employee's different Sabbath observation." 843 F.2d at 176 (emphasis added). Further, in disagreeing with any implication that an "employer may be required to force other employees into a disadvantageous permanent switch of shifts against their wishes," we noted that "the Sixth Circuit seems to have assumed that an employer's attempt to

12

seek out employees who would be *willing* to switch shifts would be a reasonable accommodation for purposes of Title VII." *Id.* (citing *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1088–89 (6th Cir. 1987)).

Here, Davis arranged for a substitute who voluntarily agreed to work Davis's shift that Sunday. That Davis lacked authority to schedule her own substitute does not take away from the fact that there was at least one volunteer to work Davis's shift. With a volunteer substitute available, Fort Bend would not have had incur any cost *requiring* an employee to substitute for Davis, nor would Fort Bend necessarily be left short-handed. *See Antoine*, 713 F.3d at 839–40 (holding that the availability of a voluntary shift swap procedure precluded employer's argument that accommodating plaintiff would have imposed the undue hardship of a "forced, unilateral reassignment by [the employer]"). Because Fort Bend does not argue that permitting Davis's arranged substitute to work in place of Davis would impose an undue hardship, there exists a genuine dispute of material fact whether Fort Bend would have suffered undue hardship in accommodating Davis's religious observance. The district court's grant of summary judgment based upon Fort Bend's undue hardship was error.

## B.   Davis's Title VII Retaliation Claim

Separate from a religious discrimination claim, Title VII makes it unlawful for an employer to retaliate against an employee who opposes an employment practice that violates Title VII. 42 U.S.C. § 2000e-3(a).

Because Davis does not present any direct evidence of retaliation, her retaliation claim is evaluated under the *McDonnell Douglas* burden-shifting framework. *See Septimus v. Univ. of Hous.*, 399 F.3d 601, 607–08 (5th Cir. 2005) (applying the *McDonnell Douglas* framework in a Title VII retaliation case). The *McDonnell Douglas* framework requires a plaintiff first to

demonstrate a prima facie case of retaliation. *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 388 (5th Cir. 2007). To set out a prima facie case of Title VII retaliation, a plaintiff must show "(1) that she engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action." *Ikossi–Anastasiou v. Bd. of Supervisors of La. State Univ.*, 579 F.3d 546, 551 (5th Cir. 2009) (citations and internal quotation marks omitted). "If the employee establishes a prima facie case, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision. After the employer states its reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation." *LeMaire*, 480 F.3d at 388–89 (citation omitted).

Here, Davis meets neither her summary judgment burden at the prima facie stage with respect to Fort Bend's alleged pre-termination actions, nor her burden at the pretext stage with respect to her termination.

As to Davis's prima facie case, the primary dispute is whether adverse employment action occurred. To establish that she suffered adverse employment action, Davis must show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation and internal quotation marks omitted). This materiality requirement separates "significant from trivial harms." *Id.*

In *White*, the Supreme Court explained that "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67. Thus, "petty slights, minor annoyances, and simple lack of good manners" are not actionable retaliatory

conduct; Title VII "does not set forth a general civility code for the American workplace." *Id.* at 68 (citations and internal quotation marks omitted). Importantly, "the significance any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id.* at 69. For example,

> A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

*Id.* (citations omitted).

Davis points to several actions as adverse: (1) subjecting her to daily thirty-minute meetings with upper management that were not required of similarly situated employees; (2) superseding her authority by giving orders and assigning different projects and tasks directly to Davis's staff; (3) removing her administrative rights from the computer server; (4) reducing her staff from fifteen to four employees; and (5) terminating her employment. Davis contends that these acts, both individually and in the aggregate, constitute adverse employment action.

Simply listing the employment actions that Davis believes were adverse does not meet her burden on summary judgment because she makes no effort to evidence the circumstances that make those actions "materially adverse." *See White*, 548 U.S. at 68. Again, "[c]ontext matters." *Id.* at 69. For example, whether removing her administrative rights from the computer server was an actionable "significant" harm or a non-actionable "trivial" harm may depend upon, at the least, Davis's need for administrative rights. Administrative rights may have been required for Davis to perform her duties, or those rights

15

may have been a convenience. Davis fails to offer any evidence on the matter and, thus, fails to evidence a genuine dispute of material fact.

Ford's thirty-minute meetings, direct assignment of work to Davis's staff and reduction of her staff similarly lack context. *See White*, 548 U.S. at 71 ("Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case . . . ."). Although Davis alleged in her complaint that Ford's "malice and retaliation tactics against [her] caused discord and conflict amongst the IT employees including [her] personal staff," this assertion does not implicate any impact on Davis herself. She does not offer any evidence to show, for example, that these actions were "the result of any fault on [her] part, such as might carry a stigma in the workplace," *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009); that "she suffered a diminution in prestige or change in standing among her co-workers" because of these actions, *id.*; that she viewed these actions as a demotion[2] or that such actions embarrassed her, *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 485 (5th Cir. 2008); or that these actions made her duties "more arduous," *White*, 548 U.S. at 71 (internal quotation marks omitted). Without any evidence of the context of these pre-termination actions, there is no genuine dispute whether Davis suffered an "adverse impact" as a result of Ford's pre-termination actions. *See Stewart*, 586 F.3d at 332.

Turning to her termination, there is no dispute that it was an adverse action. However, Davis does not present any evidence that Fort Bend's legitimate, non-retaliatory reason for terminating her—that she failed to report to work—was pretext for retaliation. Instead, she argues only that Fort

---

[2] Davis argued in briefing that she was "effectively demoted" when Ford reduced the number of her direct reports, but points us to no evidence in the record that she felt this was a demotion.

Bend's reason for terminating her was pretext for its *religious discrimination.* This is irrelevant to her *retaliation* claim. *LeMaire*, 480 F.3d at 388–89 ("After the employer states its reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext *for retaliation.*" (emphasis added) (citation omitted)). Fort Bend has therefore stated a legitimate, non-retaliatory reason that Davis has not rebutted.

In sum, Fort Bend asserted the absence of evidence demonstrating an adverse employment action, and of evidence demonstrating pretext. Davis thus had to bear the burden of producing evidence demonstrating the existence of a genuine dispute of material fact as to these issues, but failed to meet that burden. *See Celotex Corp.*, 477 U.S. at 322. Summary judgment was proper as to Davis's Title VII retaliation claim.

## IV. CONCLUSION

The district court's summary judgment on Davis's Title VII religious discrimination claim is REVERSED, and its summary judgment on Davis's Title VII retaliation claim is AFFIRMED. The matter is REMANDED for further proceedings in accordance with this opinion.

No. 13-20610

JERRY E. SMITH, Circuit Judge, dissenting:

In its well-written opinion, the majority errs in holding that our inquiry is limited to the sincerity of an employee's alleged religious belief; we must also consider whether that belief is "religious" in nature or merely a personal preference or a secular social or economic philosophy. The district court correctly found that Davis's failure to appear for work was motivated by a personal commitment and not a religious belief protected under Title VII. The majority also mistakenly decides that accommodating Davis's belief did not constitute an undue hardship. (I agree with the majority's disposition of the retaliation claim.) Because I would affirm the summary judgment, I respectfully dissent.

## I.

## A.

The majority strays in opining that courts may not consider the religious nature of an employee's alleged beliefs but instead must focus solely on sincerity. I have no qualm about the majority's discussion regarding the sincerity of Davis's belief, but that is not at issue. The county does not dispute her sincerity, and her opening brief states as much: "*[S]incerity* is not at issue here."

Title VII does not protect beliefs merely because they are sincerely or strongly held.[1] Instead, it protects employees from discrimination based on their "religion," 42 U.S.C. § 2000e-2(a)(1), defined to include "all aspects of *religious* observance and practice, as well as belief," 42 U.S.C. § 2000e(j). As a result, the *prima facie* case for religious accommodation requires the plaintiff

---

[1] *Cf.* EEOC Compliance Manual § 12-I(A)(1) (EEOC 2009), *available at* 2008 WL 3862096.

No. 13-20610

to show that he "had a *bona fide* religious belief that conflicted with an employment requirement."[2]  The district court found that Davis's belief was not religious: "[Her] absence from work was due to personal commitment, not religious conviction"; the court found that she "did not present a conflict between religious beliefs and employment requirements; [she] presented a conflict of time."  *This* is the real issue presented to us on appeal.

Only a couple of sentences of the majority opinion pertain to whether Davis's belief was "religious." In its cursory review, the majority asserts, without analysis, that our "inquiry is limited to focusing upon the individual and whether her belief is sincere, or 'truly held'; whether the belief itself is central to the religion, i.e., whether the belief is a religious tenet, is 'not open to question,'" citing *Moussazadeh v. Texas Department of Criminal Justice*, 703 F.3d 781, 790 (5th Cir. 2012) (Smith, J.).  Not only is the holding not supported by *Moussazadeh*, but it is contrary to the plain language of Title VII and to the precedents of the Supreme Court, this court, and all of our sister circuits to have addressed this issue.

In *Moussazadeh*, *id.*, the parties did not dispute that "eating kosher food constitutes a 'religious exercise'" under the RLUIPA.  The only issue was whether the prisoner sincerely held that religious belief.  Contrary to the majority's selective quotation of six words from its discussion of sincerity, *Moussazadeh* does not hold that courts cannot look into the religious character of a belief.  It merely states that "while the 'truth' of a belief is not open to question, there remains the significant question of whether it is 'truly held.'"  *Id.* (quoting *United States v. Seeger*, 380 U.S. 163, 185 (1965)).

---

[2] *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 273 (5th Cir. 2000); *see also EEOC v. Abercrombie & Fitch Stores, Inc.*, 731 F.3d 1106, 1122 (10th Cir. 2013).

No. 13-20610

In *Seeger*, the Court provided further guidance on courts' proper role in considering the religiosity of beliefs:

> The validity of what [the plaintiff] believes cannot be questioned. Some theologians, and indeed some examiners, might be tempted to question the existence of the registrant's "Supreme Being" or the truth of his concepts. But these are inquiries foreclosed to Government. As Mr. Justice Douglas stated in *United States v. Ballard*, 322 U.S. 78, 86 (1944): "Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are real as life to some may be incomprehensible to others." Local boards and courts in this sense are not free to reject beliefs because they consider them "incomprehensible." Their task is to decide whether the beliefs professed by a registrant are sincerely held and *whether they are, in his own scheme of things, religious.*
>
> But we hasten to emphasize that while the "truth" of a belief is not open to question, there remains the significant question whether it is "truly held." This is the threshold question of sincerity which must be resolved in every case.

*Seeger*, 380 U.S. at 184−85. In other words, courts cannot look into whether the religious belief is true—for example, whether the angel Gabriel truly appeared to Muhammad, whether the Middle Way is indeed the path to enlightenment, or whether Jesus is in fact the Christ.[3] Instead, courts are tasked with deciding not only whether the alleged belief is "sincerely held" but also "whether [the beliefs] are . . . *religious.*" *Id.* at 185.

The majority holding also conflicts with the decisions of every circuit to

---

[3] *See Ballard*, 322 U.S. at 86–87 ("The religious views espoused by respondents might seem incredible, if not preposterous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When triers of fact undertake that task, they enter a forbidden domain.").

have addressed this issue.  Consistently with *Seeger*, the First,[4] Fourth,[5] Seventh,[6] Eighth,[7] and Tenth[8] Circuits have held that courts must consider both whether a belief is religious in nature and whether it is sincerely held. No circuit has held—in a published or unpublished opinion—as the majority does today.

Even this circuit has implied that courts must consider whether the employee's belief is religious in nature.[9]  For example, in *Cooper v. General Dynamics, Convair Aerospace Division, Fort Worth Operation*, 533 F.2d 163

---

[4] *See, e.g., EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 56 (1st Cir. 2002) ("In order to satisfy this element, the plaintiff must demonstrate both that the belief or practice is religious and it is sincerely held."); *cf. Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 130–32 (1st Cir. 2004).

[5] *See, e.g., Dachman v. Shalala*, 9 F. App'x 186 (4th Cir. 2001) ("While an employer has a duty to accommodate an employee's religious beliefs, the employer does not have a duty to accommodate an employee's preferences.").

[6] *See, e.g., Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 448 (7th Cir. 2013) ("[T]he belief necessitating the accommodation must actually be religious."), *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1996) ("In order to establish a prima facie case of religious discrimination, a plaintiff must show that the observance or practice conflicting with an employment requirement is religious in nature. . . ."); *Redmond v. GAF Corp.*, 574 F.2d 897, 901 n.12 (7th Cir. 1978) ("We believe the proper test to be applied to the determination of what is "religious" under § 2000e(j) can be derived from the Supreme Court decisions in [*Welsh*], and [*Seeger*], i.e., (1) is the 'belief' for which protection is sought 'religious' in person's own scheme of things, and (2) is it 'sincerely held.'").

[7] *See, e.g., Vetter v. Farmland Indus., Inc.*, 120 F.3d 749 (8th Cir. 1997) ("An employer need not accommodate a purely personal preference." (internal quotation marks omitted)); *Brown v. Gen. Motors Corp.*, 601 F.2d 956, 959 (8th Cir. 1979) (holding that Title VII "does not require an employer to reasonably accommodate the purely personal preferences of its employees.").

[8] *See, e.g., EEOC v. Abercrombie & Fitch Stores, Inc.*, 731 F.3d 1106, 1119 (10th Cir. 2013) ("[B]ecause religious beliefs have a distinctive content related to ultimate ideas about life, purpose, and death, logically, even if an applicant or employee claims to be acting for 'religious' reasons, if those reasons actually do not pertain to such ultimate ideas, then that person's conduct would fall outside the protective ambit of Title VII—*viz.*, the conduct would not truly relate to religious matters.").

[9] *See, e.g., Anderson v. Browning-Ferris, Inc.*, 29 F.3d 623, *2 & n.2 (5th Cir. 1994) (per curiam) (unpublished); *Eversley v. MVBank Dall.*, 843 F.2d 172, 175 n.2 (5th Cir. 1988); *Brown v. Dade Christian Schs., Inc.*, 556 F.2d 310, 324 (5th Cir. 1977) (en banc) (Roney, J., dissenting); *Theriault v. Carlson*, 495 F.2d 390, 394–95 (5th Cir. 1974).

(5th Cir. 1979), we chided a district court that had evaluated a plaintiff's religious belief, and we "concluded that it was irrational and specious"; we stated that such conclusions are "not for federal courts, powerless as we are to evaluate the logic or validity of beliefs *found religious* and sincerely held." *Id.* at 166 n.4 (emphasis added) (citing *Seeger*, 380 U.S. at 184–85). Although the majority cites this very language in support of its holding, again it does so having missed the very meaning of the words: We may not, as courts, consider the verity or "validity" or truth of beliefs that are *found religious* and sincerely held. Implicit with this statement, however, is that courts may—and must— find that those beliefs are in fact religious in nature as well as sincerely held.

For thirty years, district courts in this circuit have also considered the religious nature of beliefs when at issue in Title VII cases.[10] Therefore, not only is the majority's opinion in conflict with the direction of the Supreme Court and the holdings of our sister circuits, but it represents a departure from longstanding Fifth Circuit practice. Thus, contrary to the majority's holding, not only may we consider whether an employee's belief is religious in nature under Title VII, but we must do so where, as here, it is disputed.

A belief is "religious" if it is a "sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by [ ] God." *Seeger*, 380 U.S. at 176. Such a belief is "not merely a matter of personal preference, but one of deep religious conviction, . . . intimately related to daily living." *Wisconsin v. Yoder*, 406 U.S. 205, 216 (1972). These statements "define

---

[10] *See, e.g., Brown v. Pena*, 441 F. Supp. 1382, 1385 (S.D. Fla. 1977), *aff'd*, 589 F.2d 1113 (5th Cir. 1979); *see also Toronka v. Cont'l Airlines, Inc.*, 649 F. Supp. 2d 608, 611–12 (S.D. Tex. 2009) ("Initially, the Court must determine whether Tornoka's 'moral and ethical belief in the power of dreams based on his religious convictions and traditions of his national origin of African descent' is a religious belief."); *McCrory v. Rapides Reg'l Med. Ctr.*, 635 F. Supp. 975, 979 (W.D. La. 1986).

religious practices to include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional views" whenever the religious nature of a belief is at issue. 29 C.F.R. § 1605.1. These include "not only traditional, organized religious such as Christianity, Judaism, Islam, Hinduism, and Buddhism, but also religious beliefs that are new, uncommon, not part of a formal church sect, only subscribed to by a small number of people, or that seem illogical or unreasonable to others." EEOC Compliance Manual § 12-I(A)(1). But, typically these beliefs concern "ultimate ideas about life, purpose, and death." *Id.*[11] Therefore, to be entitled to constitutional or statutory protection, an observance, practice, or belief must be motivated by this broad definition of "religion" and not mere personal preference or secular philosophy, whether social, political, or economic.[12]

---

[11] S*ee also Abercrombie*, 731 F.3d at 1119; *Brown*, 556 F.2d at 324 (Roney, J., dissenting) ("[A]s the very cases cited by the plurality demonstrate, the 'religious' nature of a belief depends on (1) whether the belief is based on a theory 'of man's nature or his place in the Universe,' (2) which is not merely a personal preference but has an institutional quality about it, and (3) which is sincere." (citations omitted)).

[12] *See Yoder*, 406 U.S. at 216 ("[I]f the Amish asserted their claims because of their subjective evaluation and rejection of the contemporary secular values accepted by the majority, much as Thoreau rejected the social values of his time and isolated himself at Walden Pond, their claims would not rest on a religious basis. Thoreau's choice was philosophical and personal rather than religious . . . ."); *Anderson*, 29 F.3d at *2 ("The Supreme Court has characterized a 'religious' belief entitled to constitutional or statutory protection as 'not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living." (quoting *Yoder*, 406 U.S. at 216)); *see also Brown*, 441 F. Supp. at 1385 ("Plaintiff's 'personal religious creed' concerning Kozy Kitten Cat Food [that it contributed to his well-being] can only be described as such a mere personal preference and, therefore, is beyond the parameters of the concept of religion as protected by the constitution or, by logical extension, by 42 U.S.C. § 2000e et seq."), *aff'd*, 589 F.2d 1113 (5th Cir. 1979); *Bellamy v. Mason's Stores, Inc.*, 368 F. Supp. 1025, 1026 (E.D. Va. 1973) (holding that the Ku Klux Klan is not a religion under the meaning of Title VII because the "proclaimed racist and anti-semitic ideology" has "a narrow, temporal and political character inconsistent with the meaning of 'religion' as used in § 2000e."), *aff'd*, 508 F.2d 504 (4th Cir. 1974).

B.

Applying the proper inquiry, we must decide what practice, observance, or belief Davis claims is protected under Title VII. Then we must consider whether she produced evidence that this belief is "religious" in her own scheme of things and whether it conflicted with an employment requirement.

Davis's testimony demonstrates that neither Sabbath-day observance nor her regular attendance at church services conflicted with Fort Bend County's requirement to work on Sunday and therefore are not at issue on appeal.[13] Instead, it was her commitment to participate in her church's special community-service project that she claims was in conflict with her employment requirements.[14] We must therefore decide whether the record supports a finding that religious belief—rather than personal preference or secular philosophy—motivated her commitment.

Davis claims that, for three main reasons, the community-service project constitutes a religious belief: (1) Davis testifies that she has been a faithful member of her congregation for about four years before the event. In light of her obvious devotion, the only reasonable inference to be drawn from her participation in a church event is that it was motivated by a religious belief. (2) Davis—contrary to the majority's assertion—did not testify that she needed to be off work "as a religious matter." She did, however, refer to the community service as a religious commitment in her complaint, and once in her testimony

---

[13] Davis testified that she first learned in March or April that the big move into the new courthouse would take place over the long Independence Day weekend, including Sunday, July 3. When she first learned of the move, she testified that "[she] had no conflict."

[14] It was not until a week before the move that she realized that she did not wish to work the following Sunday; her pastor had requested all members participate in the community service event accompanying the ground-breaking for the new chapel on that date, and Davis committed to head the volunteer program tasked with feeding the community throughout the event. She informed the county of this conflict two days before the move.

as a "Sunday religious activity." This alone, her reasoning continues, is sufficient to create a genuine issue of material fact regarding whether she was motivated by a *bona fide* religious belief. (3) Alternatively, Davis claims that her Christian belief in service and "feeding the community" required her participation in the Sunday service event.

First, Davis improperly focuses on the nature of the activity rather than the motivation behind it.[15] Depending on what motivated it, the very same activity can be both protected and unprotected under Title VII. One might be a vegetarian because one adheres to the Jain concept of Ahisma, requiring nonviolence. Or, one might be a vegetarian because one merely believes it to be the healthier food option. The former, motivated by a religious belief, is protected by Title VII; the latter, a personal preference, is not.

Similarly, even an activity ostensibly connected with a church or associated with a religious practice might not be motivated by religious belief and, therefore, would remain unprotected. For example, attending Sunday Mass out of obedience to God's commands is protected religious belief, but attending Mass because one enjoys listening to the choir is not.[16] Likewise, volunteering at a Christmas party in order to worship or celebrate the Christ Child is protected, but doing so out of a sense of social or familial obligation is not.[17] Just because an activity involves an activity or practice that is often associated with

---

[15] *Cf. Cooper,* 533 F.2d at 168 ("If the employee's conduct is religiously motivated, his employer must tolerate it unless doing so would cause undue hardship to the conduct of his business.").

[16] *See, e.g., Anderson*, 29 F.3d at *2 n.2 (relating how the plaintiff felt obligated to attend his church service not because of Sabbath-day worship but in order to retain his position as usher and trustee of the church).

[17] *See, e.g., Wessling v. Kroger Co.*, 554 F. Supp. 548, 552 (E.D. Mich. 1982) (finding that a plaintiff's request to volunteer at a Christmas party was "not a religious observance protected by Title VII" because "[i]t was family oriented, a family obligation, not a religious obligation.").

religion or religious belief does not end the inquiry: A reasonable jury must be able to find that a *religious* belief conflicted with the employment requirement.

In other words, the fact that Davis—devoted as she may be—participated in an activity associated with her church, at the request of her pastor, does not mean the activity necessarily constitutes a religious practice, observance, or belief.[18] Her participation in *that* activity must be motivated by her own, personal religious belief. Certainly, if she agreed to babysit her pastor's children at the church as a personal favor to him, Title VII would not apply, no matter her devotion to her faith. By that same token, the court must consider whether Davis produced evidence that her *personal* religious belief—and not necessarily the religious doctrine or tenets of her church or religion as broadly understood—required her participation at the groundbreaking ceremony.

Considering the record as a whole, Davis has failed to provide sufficient evidence to create a genuine issue of material fact. Although she did refer to the community service as a religious commitment in her complaint and once as a "Sunday religious activity" in her testimony, "an employee is not permitted to redefine a purely personal preference or aversion as a religious belief."[19] Mere conclusional language that the belief is "religious," without more, is

---

[18] *Abercrombie*, 731 F.3d at 1119 ("[A]n applicant or employee may engage in practices that are associated with a particular religion, but do so for cultural or other reasons that are not grounded in religion. If so, an employer's discrimination against that individual for engaging in that practice . . . would not contravene Title VII's religion-discrimination provisions. This is true of course because, despite the practice's customary association with religion, the applicant's or employee's motivation for engaging in the practice would not be religious.").

[19] *Reed v. Great Lakes Cos.*, 330 F.3d 931, 935 (7th Cir. 2003); *see also Seshadri v. Kasraian*, 130 F.3d 798, 800 (7th Cir. 1997) ("He claims that this is a religious creed, and he appeals to the provision of Title VII that forbids discrimination on grounds of religion. He refuses, however, to identify the religion. He claims a right not to do so, pointing out that government has no right to require a person to state his religious beliefs or affiliations. True enough; but a person who seeks to obtain a privileged legal status by virtue of his religion cannot preclude inquiry designed to determine whether he has in fact a religion.").

insufficient.[20]  Even if one refers to his personal preference for eating cat food as a "personal religious creed," for example, merely terming the activity or belief as such cannot make "religious" what is not.[21]

Instead, the plaintiff must produce evidence of the motivation behind the practice, observance, or belief that is religious in nature.  This is not an onerous or difficult task; testimony by the plaintiff describing this motivation in terms meeting the broad standard for what is "religious" will usually suffice to survive summary judgment.  For example, if one were to testify that he believes the goddess Bastet commanded him to eat cat food in worship of her divinity, and he sincerely holds that belief, he has provided sufficient evidence of a *bona fide* religious belief.  This is so even if Bastet did not in fact give that command and the record reflects that this is not a generally recognized tenet of Bastet worship.[22]  Although this requirement might often go undisputed or be easily

---

[20] *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." (internal quotation marks omitted)); *Hussein v. The Waldorf-Astoria*, F. Supp.2d 591, 597 (S.D.N.Y. 2001) ("[Plaintiff] offers only a conclusory assertion that his religion required him to wear a beard.); *cf. Pedreira v. Ky. Baptist Homes for Children, Inc.*, 579 F.3d 722, 728 (6th Cir. 2009) ("Pedreira has not alleged any particulars about her religion that would even allow an inference that she was discriminated against on account of her religion.").

[21] *See Brown*, 441 F. Supp. at 1384–85; *see also Seshardi*, 130 F.3d at 800; *Hussein*, 134 F. Supp.2d at 597 ("Title VII does not require the accommodation of personal preferences, even if wrapped in religious garb.").

[22] *See Seshardi*, 130 F.3d at 800 ("It is true that the EEOC, following [*Seeger*], does not think that the plaintiff in a case of religious discrimination must be a member of an authorized church or subscribe to its full menu of orthodox beliefs.  We agree.  For otherwise Jesus Christ, a heterodox Jew, could not be regarded as having been a victim of religious persecution.  Heretics are a principal target of religious persecution."); *EEOC v. Red Robin Gourmet Burgers, Inc.*, No. C04-1201JLR, 2005 WL 2090677, at *3–4 (W.D. Wash. 2005) (holding that an employee sufficiently established a *bona fide* religious belief even though the record reflected that the belief lacked scriptural or historical support in the practice of Kemetecism); *see also A.A. v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 261 (5th Cir. 2010) ("[T]he guarantee of free exercise is not limited to belies which are shared by all of the members of a religious sect." (internal quotation marks and citation omitted)); 29 C.F.R.

met in most cases,[23] that fact does not absolve the plaintiff from bearing his burden.[24]

Davis did not testify that she "needed" to attend her church's community service project because of "religious" motivation, even under the broad definition of "religious." She states *only* that her "Pastor requested all members participate in this highly anticipated community service event," that she "was in charge of the volunteer program that was responsible for feeding three hundred (300) people," and that her "church depended on her to be there." In other words, Davis "needed" to attend the community service project on Sunday, July 3 not because her personal conception of religion required her attendance but because she had made a personal, social commitment to her pastor and fellow church members who were depending on her being there.

Based on this record, a reasonable jury could not conclude that Davis was motivated by a *bona fide* religious belief. It was her personal preference to prioritize her social commitment to her pastor over her commitment to her employer. Such a personal preference does not constitute a *bona fide* religious belief as a matter of law, and Title VII does not require an employer to accommodate it.

In the alternative, Davis argues for the first time on appeal that her faith requires that she follow Christ's example in "feeding the community." This, she claims, was her motivation in attending the community service project and

---

§ 1605.1 ("The fact that no religious group espouses such beliefs or the fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee or prospective employee.").

[23] *See EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 56 (1st Cir. 2002).

[24] *Neely v. PSEG Tex., Ltd. P'ships*, 735 F.3d 242, 246 (5th Cir. 2013) ("[T]hough the ADAAA makes it *easier* to prove a disability, it does not *absolve* a party from proving one.").

constitutes a *bona fide* religious belief. This notion too fails. Assuming that the record supported that she was motivated by this religious belief, Davis has failed to provide evidence that her religious belief in "feeding the community" actually conflicted with her employment requirement. Even if her religion required her to feed the community, Davis has failed to show that it required her to do so on Sunday, June 3.[25]

In *Tiano v. Dillard Department Stores, Inc.*, 139 F.3d 679, 682 (9th Cir. 1998), the court held that an employer did not have to accommodate an employee's religious belief that she needed to go on a pilgrimage to Medjugorje because the evidence presented evinced no temporal mandate requiring the pilgrimage take place at the time she left. "Otherwise, the employer is forced to accommodate the personal preferences of the employee—the timing of the trip. Title VII does not protect secular preferences." *Tiano*, 139 F.3d at 682. The court held that the mere statement that she "needed" to go was insufficient without corroborating evidence that the timing was motivated by her religious belief and because the record reflected that there were other opportunities serve as a pilgrim that did not conflict with her work schedule.[26]

Likewise, in *Dachman v. Shalala*, 9 F. App'x 186, 192 (4th Cir. 2001), the court held that an employer did not have to accommodate a Jewish

---

[25] *See, e.g., Anderson*, 29 F.3d at *2–3; *Bush v. Regis Corp.*, 257 F. App'x 219, 221–22 (11th Cir. 2007) ("Bush argues that the Sunday shift prevented her from doing field service with her family, which constituted a bona fide religious belief. The record, however, indicates that field service was not required to be performed on Sundays; rather, that was the day Bush and her family *wished* to perform field service.").

[26] *Tiano*, 139 F.3d at 682–83 ("She offered no corroborating evidence to support the claim that she had to attend the pilgrimage between October 17 and 26. For example, she did not testify that the visions of the Virgin Mary were expected to be more intense during that period. Nor did she suggest that the Catholic Church advocated her attendance at the particular pilgrimage. In short, her lone unilateral statement that she 'had to be there at that time' was her only evidence.").

employee who claimed she needed leave every Friday to pick up Challah bread for the Sabbath because it was merely her preference to do so on Friday. Although this was inconvenient for her to purchase the bread on Thursday, the employer did not have to accommodate her personal preferences in opting for a Friday pickup.[27]

Similarly, although her personal religious belief might require her to feed the community, Davis has not put forward any evidence that there was a temporal mandate for her to participate in *this* service on *this* particular Sunday. Undoubtedly, she would have had other opportunities to feed the community at times that would not conflict with her work schedule. Also, her testimony suggests that it was her preference to feed the community at that community service event because the church was depending on her after she had volunteered to participate. Therefore, she "[can] not satisfy one crucial element of her *prima facie* case: conflict between her religious belief and employment duties."[28]

Because Davis fails to establish a *prima facie* case, the district court correctly granted summary judgment. Davis has not provided evidence establishing a religious belief that was in conflict with an employment requirement. Instead, the record supports only the conclusion that Davis's personal commitment to her pastor kept her from reporting for work on Sunday, July 3. Because she was not motivated by *religious* belief, or a religious belief that

---

[27] *Dachman*, 9 F. App'x at 192. ("While an employer has a duty to accommodate an employee's religious beliefs, the employer does not have a duty to accommodate an employee's preferences. In this case, appellant's own testimony confirmed that her decision to pick up the bread on Friday afternoon was simply her preference and not a religious requirement. As such, her employer did not have a duty to accommodate this preference." (citing *Tiano*, 139 F.3d at 682)).

[28] *Tiano*, 139 F.3d at 683; *see also Dachman*, 9 F. App'x at 192.

No. 13-20610

conflicts with employment requirements, Title VII does not require Fort Bend County to accommodate her conflict.

## II.

Even assuming Davis created a genuine issue of material fact regarding whether her "religions" belief conflicted with an employment requirement, the majority errs because accommodating Davis's belief constituted an undue hardship. The majority relies heavily on the fact that Davis found a volunteer replacement in holding there to be no undue hardship as a matter of law. The majority maintains that this alone is enough to establish a dispute of material fact to survive summary judgment. In doing so, however, the majority overlooks that the existence of a volunteer alone is insufficient if even the use of the volunteer would have reasonably resulted in "decreased efficiency, economic loss, and increased risk."[29]

More specifically, the majority does not examine the qualifications of the proffered volunteer. Not any volunteer that a plaintiff can convince to substitute will be sufficient to defeat a defendant's establishment of undue hardship.[30] Even the majority would agree that any surgeon demanding accommodation cannot merely substitute the hospital janitor, no matter how willing he is to volunteer. The fact that Davis found a volunteer, although relevant, does not end our inquiry. We must consider whether he is qualified such that

---

[29] *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 146 (5th Cir. 1982) (stating that the proposed solution of having another employee substitute had resulted in decreased efficiency).

[30] *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977); *see also id.* at 85–86, 90 n.4, 92 n.6 (Marshall, J., dissenting) (quoting the EEOC example of undue hardship relied upon by the majority as "where the employee's needed work cannot be performed by another employee *of substantially similar qualifications* during the period of absence" (emphasis added)).

the substitution does not constitute only a *de minimis* cost to the employer.

Davis relies solely on the fact that her volunteer had occasionally filled in for her in the past as evidence that she was qualified to fill in for her on Sunday, July 3. That argument is unavailing, however, because (1) Fort Bend County's IT department was engaged in an unusually large and complex undertaking with a strict deadline and little room for error correction that (2) in its reasonable judgment required the attendance and support of all departmental supervisors. Davis does not contend, nor is their evidence to support, a finding that her volunteer was either a qualified supervisor or had filled in for her in the past during a comparably difficult managerial task.

Both sides agree that the move into the new courthouse was an extraordinary event within the IT department. It represented a huge undertaking that required months of planning and—as Davis has testified—many long days and nights of preparation by supervisors in the preceding weeks in order to ensure a smooth transition.[31] The IT department had only the extended Fourth of July weekend to complete the transfer and installation of all IT systems within the new courthouse and to ensure that they were functional before the start of business the following week.

Because of the importance and enormity of the task at hand, all supervisors were required to be present to minimize the risk of failure. The director of the IT department, testified via affidavit that he instructed Ford to deny Davis's request to be excused on Sunday because the "absence of a supervisor . . . would have required other employees to assume a disproportionate workload." "[Her] role as Desktop Support Supervisor during the holiday weekend

---

[31] Davis testified that she worked every weekend for about two or three months in preparation for the move.

No. 13-20610

move to the Justice Center was vital to the efficiency of the move, her absence increased the risk that the computers would not be installed and functional when the Court system opened for business . . . ." "[B]ecause of the risk and the enormity of the tasks to be completed in such a short amount of time," *all* members of the management team and supervisors were required to work throughout the weekend. And, in fact, all of those managers and supervisors did show up to work throughout the weekend, except for Davis.

Davis does not dispute that her volunteer was not a supervisor but merely a subordinate member of the IT staff. Although the volunteer had occasionally filled in for Davis, the record contains no evidence that she had either filled-in for Davis during a comparably complex managerial assignment or that she had similar experience or qualifications in tackling such a task. Therefore, Davis did not provide a qualified volunteer to cover her absence.

With this testimony, Fort Bend County met its responsibility to produce evidence that this action created an undue burden. In response, Davis failed to show a genuine dispute of material fact because she failed to provide evidence of a volunteer with similar job qualifications or that the absence of a supervisor did not increase the risk of economic loss or efficiency.[32] Although reviewing courts must "draw all reasonable inferences in favor of the non-moving party," courts cannot invent out of whole cloth evidence that *if in the record* would support the nonmoving party's position or draw inferences in

---

[32] Although the move occurred without any significant issues and employees were released early on Sunday as a result, we cannot allow hindsight bias to cloud our analysis. Instead, we must consider whether accommodation posed an increased risk to the employer *ex ante*, even if that risk did not materialize *ex post*. "Title VII does not require an employer to actually incur accommodation costs before asserting that they are more than *de minimis*." *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 501 (5th Cir. 2001); *see also Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 274 (5th Cir. 2000) (holding that the "mere possibility of an adverse impact . . . is sufficient to constitute an undue hardship").

favor of the nonmoving party that are unreasonable or unsupported by the evidence *actually in the record*.[33]

Any inference that Davis's volunteer was qualified to replace her in the monumental managerial task is unreasonable based on this record. Replacing a supervisor with an employee who is neither a supervisor nor has similar job qualifications for the task at hand created an increased risk to the county. This is, as a matter of law, a greater than *de minimis* injury.[34] Therefore, accommodation constituted an undue hardship, and the district court properly granted summary judgment on that ground.

Because I would therefore affirm the judgment in its entirety, I respectfully dissent from the conscientious decision of the majority.

---

[33] *See Caban Hernandez v. Phillip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007) ("In marshaling the facts for this purpose, we must draw all reasonable inferences in the light most favorable to the nonmovant. That does not mean, however that we ought to draw *unreasonable* inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." (citation omitted)); *cf. Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 274 (dismissing the argument that the district court failed to view all facts and inferences in the light most favorable to the nonmovant by accepting the employer's hypotheticals "regarding the effects of accommodation").

[34] *See Trans World Airlines*, 432 U.S. at 84; *Weber*, 199 F.3d at 275 (affirming summary judgment because the only suggested accommodation "would impose more than a *de minimis* cost").